FEDERAL TRADE COMMISSION,
Plaintiff,

v.

BUTTERWORTH HEALTH CORPORA-
TION, a Michigan corporation, and
Blodgett Memorial Medical Center, a
Michigan corporation, Defendants.

No. 1:96–CV–49.

United States District Court,
W.D. Michigan,
Southern Division.

Sept. 26, 1996.

Order Awarding Judgment Oct. 28, 1996.

Edith A. Landman, Asst. U.S. Attorney, Michael H. Dettmer, United States Attorney, Grand Rapids, MI, Melvin H. Orlans, Office of General Counsel, Federal Trade Commission, Washington, DC, for Federal Trade Commission.

James S. Brady, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Booth Newspapers Inc.

John D. Tully, Richard L. Bouma, Warner, Norcross & Judd, LLP, Grand Rapids, MI, Peter J. Armstrong, Jacqueline D. Scott, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, William G. Kopit, Epstein, Becker & Green, Washington, DC, for Butterworth Health Corp., Blodgett Memorial Medical Center.

Richard E. Holmes, Jr., Garan, Lucow & Miller, Grand Rapids, MI, for Physicians Health Plan of West Michigan.

Stanford P. Berenbaum, Honigman, Miller, Schwartz & Cohn, Douglas J. Golden, PC, Birmingham, MI, for Mercy Health Plans.

Michael T. Zajac, Asst. General Counsel, Blue Cross & Blue Shield of Michigan, Corporate Law Section, Detroit, MI, for Blue Cross/Blue Shield of Michigan.

Thomas W. Schouten, Dunn, Schouten & Snoap, PC, Wyoming, MI, for Grand Valley Health Plan, Inc.

Alvin D. Treado, Culver, Lague, Newman & Irish, Muskegon, MI, for Hackley Hospital.

David A. Ettinger, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Sandra Bruce, Mercy Muskegon Hospital, Mission Health Corporation, Steven Williams, St. Mary's Health Services, John Maurer, M.D., John Forsyth.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This is an action by plaintiff Federal Trade Commission ("FTC") for a preliminary injunction under § 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin the proposed merger of two Grand Rapids hospitals operated by defendants Butterworth Health Corporation and Blodgett Memorial Medical Center. The FTC contends the effect of the proposed merger "may be substantially to lessen competition," contrary to § 7 of the Clayton Act, 15 U.S.C. § 18. The FTC asks the Court to preliminarily enjoin the proposed merger pending complete administrative scrutiny thereof under the antitrust laws.

During the week of April 22 through 26, 1996, the Court conducted a hearing on the FTC's motion, receiving five full days of testimony and more than 900 exhibits. On May 30, 1996, the undersigned toured both hospitals in the company of counsel for both sides. The parties' post-hearing briefing was completed in early July. The Court now renders its decision.

## I. FACTUAL BACKGROUND

The City of Grand Rapids, in Kent County, is Michigan's second largest city, with a 1994 estimated population of 190,395. The 1994 estimated population of the Grand Rapids Metropolitan Statistical Area (including Kent, Ottawa, Allegan and Muskegon Counties) is 984,977. There are four general acute care hospitals in Grand Rapids: Butterworth Hospital, owned and operated by defendant Butterworth Health Corporation ("Butterworth"), defendant Blodgett Memorial Medical Center ("Blodgett"),[1] St. Mary's Hospital ("St. Mary's"), and Metropolitan Hospital ("Metropolitan"). Butterworth operates 529 general acute care beds. Blodgett operates 328 general acute care beds. Both

hospitals are nonprofit corporations and offer comprehensive medical and surgical services, generally classified as "primary," "secondary," and "tertiary" care services.[2]

St. Mary's and Metropolitan are smaller hospitals. St. Mary's, a Catholic hospital, owned and operated by Mercy Health Services System, operates approximately 150 general acute care beds. It provides primary care inpatient services, some secondary care services, and limited tertiary care services. Metropolitan is an osteopathic hospital that operates approximately 101 general acute care beds. It also provides primary care and limited secondary care services, but no tertiary care services.

All parties agree that Butterworth and Blodgett are prospering, well-managed hospitals. At the end of May 1995, the governing boards of the two hospitals unanimously voted to merge the two organizations. The plan to merge was precipitated by a number of circumstances. Among these are Blodgett's confining location and desire to improve its facilities and services. Blodgett is situated on a 15–acre site in the middle of a well-established residential community. The site is two and one-half miles from a major freeway, limiting ready access for emergency vehicles, delivery vehicles and patients. Parking space is also severely limited. In addition, the configuration of the existing structures does not lend itself to the transformation of facilities demanded by the growing substitution of outpatient diagnostic and treatment services for inpatient care. Considering the expenses associated with maintaining and updating its existing facility and the fact that the same physical limitations would nonetheless remain, Blodgett decided to build a replacement hospital at a cost of $187 million at a location along the east-west freeway through Grand Rapids.

---

1. Blodgett is actually located in East Grand Rapids, in close proximity to Grand Rapids.

2. Primary care services include basic or routine inpatient hospital services available at most general acute care hospitals, such as normal childbirth, general medicine and general surgery. Secondary care services include some specialties and more difficult and specialized procedures,

such as orthopedics, ophthalmology, otolaryngology (ear, nose and throat) and cardiac catheterization. Tertiary care services include the most specialized, complex and expensive procedures, such as high risk obstetric services, neonatal care, neurosurgery, heart surgery, orthopedic surgery, advanced cancer treatment and burn care.

Announcement of this plan led to the formation of the Kent County Area Health Care Facilities Study Commission ("Hillman Commission"). The Commission consisted of 23 citizens who met 17 times during a ten-month period in 1993 to study the hospitals and health care needs of Kent County and to make recommendations for future hospital planning. The Commission issued its final report in May 1994, concluding in relevant part that Blodgett should not construct a replacement inpatient facility because sufficient space already exists in the community to enable adequate service of inpatient needs. The Commission recommended Blodgett consider "reorganizing its present facilities onsite, consolidating inpatient services with other area hospitals and/or moving appropriate ambulatory and support services offsite."

Partly in response to the recommendations of the Hillman Commission, Blodgett and Butterworth began exploring the possibility of, and eventually agreed to, the proposed merger. Both hospitals contend that merger would enable them to avoid substantial capital expenditures and achieve significant operating efficiencies.

The FTC objects to the proposed merger and has moved for preliminary injunction. The hospitals have agreed not to merge prior to this Court's ruling on the motion.

## II. LEGAL FRAMEWORK

Section 7 of the Clayton Act provides in relevant part that "no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person ... where in any line of commerce ... in any section of the country, the effect of such acquisition may be substantially to lessen competition ..." 15 U.S.C. § 18. Defendant hospitals do not seriously question the FTC's authority to challenge the proposed merger at this stage of the proceedings, which authority is presumed. See *Federal Trade Comm'n v. Freeman Hosp.*, 69 F.3d 260, 266–67 (8th Cir. 1995).

■■■ The FTC's motion for preliminary injunction may be granted if the Court finds, upon weighing the equities and considering

the FTC's likelihood of ultimate success, that the injunction would be in the public interest. 15 U.S.C. § 53(b). To show a likelihood of ultimate success, the FTC must raise questions going to the merits so "serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Freeman Hosp.*, 69 F.3d at 267 (quoting *Federal Trade Comm'n v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir.1979)); *Federal Trade Comm'n v. University Health Inc.*, 938 F.2d 1206, 1218 (11th Cir.1991). To succeed on its claim under § 7 of the Clayton Act, the FTC "must show a reasonable probability that the proposed transaction would substantially lessen competition in the future." *Id.* "The current understanding of § 7 is that it forbids mergers that are likely to 'hurt *consumers*, as by making it easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level.'" *United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1282–83 (7th Cir.1990) (emphasis added) (quoting *Hospital Corp. of America v. Federal Trade Comm'n.*, 807 F.2d 1381, 1386 (7th Cir.1986)).

■■■ The FTC may make a prima facie case by showing statistically that the proposed merger would produce an entity controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of power in that market. *Id.* Establishment of this prima facie case creates a presumption of illegality which defendant hospitals may rebut through evidence undermining the predictive value of the FTC's statistics. *Id.* If defendant hospitals successfully rebut the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the FTC, which retains the ultimate burden of persuasion at all times. *Id.* at 1218–19.

## III. ANALYSIS

### A. *Prima Facie Case*

#### 1. Relevant Market

■■■ Prerequisite to establishment of the prima facie case by the FTC is definition of

the "relevant market" within which the merged entity would have significant market power. *Freeman Hosp.*, 69 F.3d at 268. The relevant market is defined by identifying competitors who could provide defendants' customers with alternative sources for defendants' services in the event defendants, as the merged entity, attempted to exercise their market power by raising prices above competitive levels. *United States v. Mercy Health Services*, 902 F.Supp. 968, 975 (N.D.Iowa 1995). A relevant market consists of two separate components, a product market and a geographic market. *Freeman Hosp.*, 69 F.3d at 268. A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to defendants' services. *Mercy Health Services*, 902 F.Supp. at 975–76. "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension of the market) or too far away (relevant geographic market), and (2) who are not likely to shift promptly to offer defendants' customers a suitably proximate alternative." *Id.* A geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Freeman Hosp.*, 69 F.3d at 268 (quoting *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995)).

### a. Product Market

■ The FTC has identified two product markets in which the merged entity would possess substantial market power: (1) general acute care inpatient hospital services, and (2) primary care inpatient hospital services. The FTC characterizes general acute care inpatient hospital services as "a common host of distinct services and capabilities that are necessary to meet the medical, surgical, and other needs of inpatients, e.g., operating rooms, anesthesia, intensive care capabilities, 24–hour nursing care, lodging, and pharmaceuticals." These services are said to represent a cluster of services and capabilities that are provided only by general acute care hospitals and for which there are no reasonable substitutes. That is, the FTC contends,

there is no alternative source outside the realm of general acute care inpatient hospitals to which a patient can turn to obtain such services in response to a small but significant price increase.

Indeed, general acute care inpatient hospital services is a product market that has been commonly used to evaluate the competitive effects of hospital mergers. See *Freeman Hosp.*, 69 F.3d at 268; *University Health*, 938 F.2d at 1211; *Mercy Health Services*, 902 F.Supp. at 976.

Defendants argue, however, that the product market cannot be so simply defined. While admitting there may be no substitute for the entire cluster of general acute care hospital services outside the realm of acute care hospitals, they argue that outpatient services can be substituted for many inpatient services and that this substitutability should be deemed to act as a constraint upon the hospitals' behavior, thereby justifying a broader product market including outpatient care providers as viable competitors. Defendants cite *United States v. Carilion Health System*, 707 F.Supp. 840, 844–45, 847 (W.D.Va.1989), *aff'd,* 892 F.2d 1042 (4th Cir. 1989), where the court found that because some inpatient services can be obtained in an outpatient clinic or doctor's office, providers of such outpatient services should be deemed to compete with hospitals in this respect and such outpatient services should be included in the relevant product market.

The argument is not compelling. See *Rockford Memorial, supra,* 898 F.2d at 1284 (J. Posner rejecting a similar argument). The evidence that consumers would use outpatient services as a substitute for some inpatient services in response to a small but significant increase in the prices of general acute care inpatient services is not substantial. Defendants' own economic expert, David Eisenstadt, Ph.D., admits as much. Clearly, there has been a trend toward greater use of outpatient services for procedures traditionally performed on an inpatient basis. This trend appears to be fueled primarily by advances in medical knowledge and technology—allowing, for instance, certain surgical procedures to be performed less invasively—

as well as advances in pharmacology. Thus, while outpatient treatment is certainly less costly than inpatient treatment, the growing use of outpatient services is not strictly responsive to economic incentives, but is a function of medical judgment, enabled by expanding treatment options. In other words, it does not appear plausible, based on the present record, that outpatient services not otherwise appropriately substitutable for acute care inpatient services would become so solely because of a small but significant increase in the price of the inpatient services.

Further, defendants' innovative effort to demonstrate that employers and third-party payors might respond to a price increase for primary and secondary acute care services by steering outpatient and tertiary care patients away from the merged entity so as to inhibit or reverse such a price increase is not persuasive. While this eventuality is plausible, it is speculative and does not serve to defeat the FTC's establishment of the relevant market.

The Court is satisfied, for purposes of the motion for preliminary injunction, that the FTC has adequately established that general acute care inpatient hospital services is a relevant product market.

■■■ The second product market identified by the FTC is primary care inpatient hospital services. The FTC defines these services as including basic or less complex services available at most general acute care hospitals, including normal childbirth, gynecology, pediatrics, general medicine and general surgical services. The FTC contends consideration of this line of services includes a greater number of hospitals that compete with defendants in connection with services for which there are no reasonable substitutes outside the realm of inpatient hospitals.

The evidentiary basis for this product market is relatively thin, but defendants' objection, for vagueness, is even weaker. The Court is satisfied, based primarily on the testimony of the FTC's economic expert, Keith Leffler, Ph.D., that primary care inpatient services is a relevant product market. Again, to the extent outpatient services may be substituted for some primary care inpatient services, the Court finds that such sub-

stitution is generally the product of medical judgment rather than purely economic inducement. The Court thus rejects defendants' contention that outpatient services should be deemed to expand the proffered primary care inpatient market.

### b. Geographic Market

■■■ The second component of the relevant market the FTC must define with respect to each of the identified product markets is the geographic market. In order to meet its burden, the FTC must present evidence of practical alternative sources to which consumers of general acute care and primary care inpatient hospital services would turn if the merger were consummated and the merged entity raised prices beyond competitive levels. Determination of the relevant geographic markets is a pragmatic, highly fact-driven undertaking. *Freeman Hosp.*, 69 F.3d at 271 n. 16.

The FTC contends the geographic area within which defendant hospitals compete with other hospitals in the provision of general acute care inpatient services is the Greater Kent County area. "Greater Kent County" is defined as including Grand Rapids, plus the area encompassed within a 30–mile radius of Grand Rapids, consisting of Kent County and portions of seven adjoining counties (southern Newaygo County, southwest Montcalm County, western Ionia County, northern Barry County, northern Allegan County, eastern Ottawa County, and eastern Muskegon County). Contained within this area are the four Grand Rapids hospitals and five smaller hospitals in primarily rural areas outside Kent County, all of which provide general acute care inpatient services: United Memorial Hospital in Greenville, Ionia Hospital in Ionia, Pennock Hospital in Hastings, Holland Community Hospital in Holland, and Zeeland Hospital in Zeeland.

This geographic market is derived fundamentally from patient flow data. Analysis of the patient flow data, the parties agree, begins with application of the "Elzinga–Hogarty test." Using information from the Michigan Hospital Association to identify the residence by zip code of each patient admitted to Michigan hospitals, and applying

the Elzinga–Hogarty test, it is possible to identify an area around defendant hospitals (1) from which most of their admitted patients come, and (2) within which most residents remain for hospital care. The relevant geographic market is identified when each of these two measures reaches a minimum threshold percentage; 75% representing a weak market, and 90% representing a strong market. In the FTC's estimation, based on the testimony of Dr. Leffler, greater Kent County comprises approximately 106 zip code areas and contains nine hospitals, approximately 90% of whose patients come from within the area. Dr. Leffler also found that approximately 90% of residents within the area who obtained hospital care obtained it at hospitals within the area.

Thus, according to Dr. Leffler's numbers, based on patient flow data from the recent past, greater Kent County represents a strong market. Defendant hospitals have not seriously challenged Dr. Leffler's analysis of the patient flow data. They have argued, however, that the FTC should be required to define a geographic area that meets the "90/90 strong market" threshold, citing *Federal Trade Comm'n v. Freeman Hosp.*, 911 F.Supp. 1213, 1218 (W.D.Mo. 1995), *aff'd* 69 F.3d 260 (8th Cir.1995). Defendants further argue, based on Dr. Leffler's prehearing deposition testimony, that greater Kent County does not meet this threshold.

Yet, even assuming a strong market standard is appropriate, and even assuming Dr. Leffler's prehearing testimony weakens his testimony given at the preliminary injunction hearing, the Court is satisfied that greater Kent County is, provisionally, the relevant geographic market for general acute care inpatient hospital services. Even if the Elzinga–Hogarty numbers for greater Kent County do not quite reach 90%—a proposition that has not been clearly established—they certainly exceed 85% and are sufficiently strong to define the relevant market for purposes of the present motion. See *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S.Ct. 1665, 1667, 16 L.Ed.2d 765 (1966) (recognizing that geographic market need not be defined with "metes and bounds"

precision). In *Freeman Hosp.*, neither the district court nor the affirming circuit court expressly held that a 90/90 strong market is appropriate or required in assessing a hospital merger. Instead, they evaluated the relative strengths and weaknesses of the proposed geographic markets and adopted the stronger one. Moreover, defendants' own economic expert, Dr. Eisenstadt, acknowledged in deposition that once the 75% threshold is surpassed, it is inappropriate to evaluate the strength of a proposed market simply on the basis of an arbitrary percentage cutoff. Consistent with the caselaw, he acknowledges that the geographic market determination must be pragmatic, based on consideration of all relevant data. Accordingly, the Court concludes the static patient flow data sufficiently strongly indicates that greater Kent County is the relevant geographic market.

Definition of the relevant geographic market does not stop here however. In addition to historical patient flow data, the Court must also consider evidence suggesting how consumers would respond to price increases by the merged entity. See *Freeman Hosp.*, 69 F.3d at 268–69; *Mercy Health Services*, 902 F.Supp. at 978.

In support of its contention that a 5 to 10% price increase would not drive defendants' patients to hospitals outside of greater Kent County, the FTC cites several indicators. The most persuasive of these are the views of consumers. See *Bathke v. Casey's Gen'l Stores, Inc.*, 64 F.3d 340, 346–47 (8th Cir. 1995) (most important dynamic evidence is that indicating where consumers could practicably turn for alternative services to avoid doing business with the antitrust defendant). Representatives of major managed care organizations and major employers in Grand Rapids, who purchase health care services on behalf of their members and employees, testified they would not attempt to steer their members or employees, respectively, away from Grand Rapids hospitals in response to a 5 to 10% price increase by the merged entity. Representatives of both groups professed respect for the strong bias among their members and employees in favor of local health care due to perceived quality of care and

convenience. Moreover, as noted by the FTC, consumers in Grand Rapids would appear to have little incentive to seek health care outside of Grand Rapids in response to a 5 to 10% price increase because defendant hospitals are presently among the least costly hospitals in Michigan. Hence, traveling outside of the greater Kent County area to avoid doing business with the merged entity would result in little or no cost savings to consumers. In addition, the FTC has shown such outmigration would be resisted by patients due to physician loyalty, inasmuch as it could entail treatment in hospitals where their own treating physicians lack admitting privileges.

The dynamic evidence presented by the FTC is not conclusive. However, defendants have not persuasively refuted it or proffered evidence that more persuasively demonstrates the appropriateness of a different geographic market. Accordingly, for purposes of preliminary injunctive relief, the Court concludes the relevant geographic market for general acute care inpatient hospital services is the greater Kent County area, as defined by the FTC.

With respect to primary care inpatient hospital services, the FTC contends the relevant geographic market consists of the "immediate Grand Rapids area," which encompasses approximately 70 zip code areas and consists essentially of all of Kent County, northwest Montcalm County, southern Newaygo County, eastern Ottawa County, northeast Allegan County, northwest Barry County and northwest Ionia County. The four Grand Rapids hospitals are the only hospitals contained within this area. Applying the Elzinga–Hogarty test to patient flow data, the FTC contends this area represents a 90/90 strong market. Additionally, the FTC has presented dynamic evidence similar to that cited above suggesting that consumers are unlikely to seek primary care inpatient services outside the immediate Grand Rapids area in order to avoid a 5 to 10% increase in prices.

Defendant hospitals' challenge to the FTC's static and dynamic evidence concerning the geographic market for primary care inpatient hospital services is also unavailing.

Defendants question whether patients in the "immediate Grand Rapids area," but outside of Kent County, might seek primary care in rural hospitals in order to avoid a 5 to 10% increase in primary care prices at defendant hospitals, but the supporting evidence is insubstantial and too speculative to undermine the FTC's prima facie case. Accordingly, for purposes of preliminary injunctive relief, the Court finds the FTC has adequately defined the relevant geographic market for primary care inpatient hospital services as the immediate Grand Rapids area.

Defendants have tried to undermine both proposed relevant markets through the testimony of Dr. Eisenstadt based on late-obtained employer and consumer surveys. Dr. Eisenstadt's testimony suggests that a 5 to 10% price increase by the merged entity would lead to a sufficient substitution of alternative services from outside the proposed markets to make such an increase unprofitable. Hence, defendants argue, the proposed markets are not accurate and the FTC has not carried its burden of satisfactorily defining the relevant markets.

The Court rejects defendants' argument for the following reasons. First, they have not proposed alternative relevant markets superior to those proposed by the FTC. As Judge Posner observed in *Rockford Memorial,* "it is always possible to take pot shots at a market definition." 898 F.2d at 1278. He went on to find that the defendant hospitals' pot shots did indeed reveal imperfections in the proposed market. Yet, the proposed market definition was upheld because it was less imperfect than the alternative. Here, defendants have not even proposed an alternative. In view of this void, the FTC's proposed markets, though imperfect, are adequately defined for purposes of preliminary injunctive relief.

Second, Dr. Eisenstadt's opinions, based on survey evidence suggesting potential product and geographic leakage of defendants' business in response to a 5 to 10% price increase, ask the Court to evaluate market definition in a manner different from that traditionally employed in the FTC Merger Guidelines and by the courts. While Dr. Eisenstadt's unconventional approach is

not irrational, the Court is not satisfied that a departure from the norm is warranted in this case.

Finally, the Court is not persuaded that the survey evidence upon which Dr. Eisenstadt's opinions are based is sound. Some of the most critical survey questions are ambiguous in material ways and some of the responses yielded are of suspect reliability.

### 2. Market Concentration

■ Having adequately defined the relevant markets, the FTC must show the proposed merger would result in a significant increase in the concentration of power in the relevant markets and repose in the merged entity an undue share of the markets. See *University Health*, 938 F.2d at 1218. A transaction resulting in a high concentration of market power and creating, enhancing, or facilitating a potential that such market power could be exercised in anticompetitive ways is presumptively unlawful. *Id.; United States v. Archer–Daniels–Midland Co.*, 866 F.2d 242, 246 (8th Cir.1988), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). Analysis of the likelihood that a merger will have anticompetitive effects begins with assessment of concentration in the relevant market. *United States v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 1193, 39 L.Ed.2d 530 (1974).

■ Market concentration is a function of the number of firms in the market and their respective market shares. In his testimony concerning market concentration, the FTC's economic expert, Dr. Leffler, relied on the Herfindahl–Hirschman Index ("HHI") to measure concentration. The HHI is calculated by squaring the market share of each competing firm in a market and adding the resulting numbers. The HHI is the most prominent method of measuring market concentration, commonly used by the Justice Department, the FTC and the courts in evaluating proposed mergers. See *University Health*, 938 F.2d at 1211, n. 12; *Federal Trade Comm'n v. PPG Ind. Inc.*, 798 F.2d 1500, 1502–06 (D.C.Cir.1986); *Freeman*

*Hosp.*, 911 F.Supp. 1213, 1221–22. Under the FTC Merger Guidelines, a post-merger HHI above 1800 is deemed to reflect a highly concentrated market, and a merger producing an increase in the HHI of more than 100 points is deemed likely to create or enhance market power or facilitate its exercise.

As a result of the proposed merger, Dr. Leffler estimated Butterworth and Blodgett would control 47 to 65% of the market for general acute care inpatient hospital services in greater Kent County, depending on whether market share is measured by licensed beds, discharges or inpatient revenues. He estimated that the post-merger HHI would range from 2767 to 4521, reflecting an increase of between 1064 and 1889 points. With respect to the primary care inpatient hospital market, Dr. Leffler estimated the merged entity would control between 65 and 70% of the market. The post-merger HHI would rise to a number between 4506 and 5079, reflecting an increase of from 1675 to 2001 points. Dr. Leffler's statistical calculations thus demonstrate that both relevant markets would be highly concentrated after the proposed merger.

Defendants do not contest Dr. Leffler's HHI calculations.[3] In the event the proposed relevant markets are accepted by the Court, they apparently concede that the merger would result in high market concentration.

Therefore, the Court concludes the FTC has established its prima facie case that the proposed merger would violate § 7 of the Clayton Act. The FTC has statistically demonstrated that the proposed merger would result in a significant increase in the concentration of power in two relevant markets, and produce an entity controlling an undue percentage share of each of those markets. In order to prevent injunctive relief, defendants must rebut this prima facie case by showing under the facts of this case, notwithstanding the statistical evidence, that the proposed merger is not likely to result in anticompetitive effects.

---

**3.** Defendants do call into question the significance of these calculations, arguing that a highly concentrated hospital market should not be pre-sumed to result in anticompetitive effects. This objection is addressed *infra*.

## B. Defendants' Rebuttal—Anticompetitive Effects

### 1. Applicability of Presumption

Defendants begin their rebuttal by arguing that high concentration in the hospital industry should not be presumed to result in anticompetitive effects. Specifically, defendants contend that empirical proof does not support the presumption that high concentration of market power among nonprofit hospitals results in price increases. In *Rockford Memorial,* Judge Posner observed "[i]t is regrettable that antitrust cases are decided on the basis of theoretical guesses as to what particular market-structure characteristics portend for competition...." 898 F.2d at 1286. It would be preferable, he noted, for the courts to be able to evaluate studies on the actual effect of concentration on price in the hospital industry. Absent such evidence to the contrary, he concluded that the standard presumption should be deemed to apply in the hospital industry. In the meantime, defendants contend, they have identified the empirical evidence needed to demonstrate the nonapplicability of the presumption.

First, defendants cite an article authored by one of their economic experts, William J. Lynk, Ph.D., *Nonprofit Hospital Mergers and the Exercise of Market Power,* Journal of Law and Economics, Vol. XXXVIII (Oct. 1995), p. 437. Based on a cross-sectional analysis of California hospitals, Dr. Lynk reached the following conclusion, stated in the final sentence of the article: "Relative to for-profit hospitals, private nonprofit hospitals in this sample have a significantly lower association between higher market shares and higher prices, and on balance increased nonprofit market share is associated with lower, not higher, prices." *Id.,* p. 459. Dr. Lynk speculated that the effect of merger on price may be negative for nonprofit hospitals because "mergers create the potential for the creation of economic efficiencies, through the consolidation of clinical services and through other means." *Id.* at 458.

In addition, Dr. Lynk undertook an evaluation of hospital service pricing data obtained from third-party payors in Michigan. In his deposition, Dr. Lynk described this analysis as essentially a replication of his earlier study of California nonprofit hospitals. Consistent therewith, he concluded that in Michigan, too, higher hospital concentration is associated with lower nonprofit hospital prices. Again, Dr. Lynk opined that this unexpected phenomenon may be due to lower costs in concentrated markets attributable to greater coordination of activities among hospitals and greater avoidance of duplicative equipment and other capital expenditures.

In response, Dr. Leffler on behalf of the FTC evaluated the same Michigan data and obtained similar results concerning the relationship between market concentration and pricing levels. Dr. Leffler went further, however, and found a positive correlation between market concentration and profit margins. Dr. Leffler reached the conclusion, not inconsistent with Dr. Lynk's, that more highly concentrated markets could be home to both lower prices and higher profit margins due to lower costs. Dr. Leffler speculated that these lower costs in more highly concentrated markets may be due to circumstances other than market concentration and may, for instance, reflect the "ruralness" of markets that tend to be more highly concentrated, costs being generally lower in rural areas.

The experts may and no doubt will debate for some time the possible causes of these unexpected empirical findings. They are in agreement at this stage, however, that high market concentration among nonprofit hospitals does not correlate positively with higher prices. Defendants have thus demonstrated good reason to question the applicability of the traditional presumption that a significant increase in market concentration will lead to higher prices in connection with the merger of nonprofit hospitals.

Consistent with the above findings, defendants also challenge the FTC charge that hospitals exercise their market power to raise prices for specific services for which they face little or no competition. Dr. Lynk, upon evaluating pricing data received from HealthCare 2000, a healthcare purchasing coalition representing over 80 Grand Rapids area employers, which has contracts with all four Grand Rapids hospitals, concluded there

is no positive correlation between market domination for a particular service and higher prices for that service. In fact, again, he found a negative correlation. That is, market dominance for a particular service is correlated with lower average relative prices in Grand Rapids.

The FTC does not challenge Dr. Lynk's findings in this regard, but questions their significance, arguing that Dr. Lynk failed to consider the extent to which Butterworth and Blodgett have refused to grant discounts to managed care companies in connection with services for which either has had a local monopoly. The FTC argues that, even though market dominance may not be positively correlated with higher prices, it is correlated with smaller managed care discounts, which reflect anticompetitive effect emanating from exercise of market power. The FTC anticipates that the proposed merger creates an appreciable danger that this sort of anticompetitive effect would be expanded.

Nonetheless, with respect to the proposition for which they are offered, Dr. Lynk's findings stand unrebutted: among nonprofit hospitals in California, Michigan and Grand Rapids, market concentration appears to be positively correlated not with higher prices, but with lower prices. The effect of increased concentration on the growth and influence of managed care organizations is addressed *infra*.

### 2. Nonprofit Status

Defendants argue the above findings demonstrate that nonprofit hospitals do not operate in the same manner as profit maximizing businesses. This is especially true, defendants contend, where as here, the boards of the merging hospitals are comprised of community business leaders who have a direct stake in maintaining high quality, low cost hospital services. Dr. Lynk made mention of this phenomenon in his study of California hospitals: "It may well be that a nonprofit hospital organization whose only function is the provision of hospital services to a well-defined population, and whose governing board effectively represents that same population, looks—and probably acts—a lot more like a consumer cooperative than a creator of

monopoly resource misallocation." Lynk, *Nonprofit Hospital Mergers, supra,* p. 458.

In *Freeman Hosp.,* the impact of this dynamic was recognized by the district court with reference to another article by Dr. Lynk:

Arguably, a private nonprofit hospital that is sponsored and directed by the local community is similar to a consumer cooperative. It is highly unlikely that a cooperative will arbitrarily raise prices merely to earn higher profits because the owners of such an organization are also its consumers. See Henry B. Hansmann, *The Role of Nonprofit Enterprise,* 89 Yale L.J. 835, 889 (1980). Similarly, if a nonprofit organization is controlled by the very people who depend on it for service, there is no rational economic incentive for such an organization to raise its prices to the monopoly level even if it has the power to do so. William J. Lynk, *Property Rights and the Presumptions of Merger Analysis,* Antitrust Bulletin, 363, 377 (1994). In the hospital context, this rationale applies to nonprofit hospitals whose boards are effectively controlled by persons representing the interests of hospital consumers or other groups that desire competitively-priced hospital services. *Id.*

911 F.Supp. at 1222. See also, *Carilion, supra,* 707 F.Supp. at 849 (recognizing that, although nonprofit status does not provide an exemption from antitrust scrutiny, it is a factor weighing in favor of finding a proposed merger reasonable).

The FTC counters by citing *University Health,* 938 F.2d at 1224; *Rockford Memorial,* 898 F.2d at 1285; and *Mercy Health Services,* 902 F.Supp. at 989. In all three cases, the courts refused to find merging hospitals' nonprofit status, alone, sufficient to rebut the government's prima facie case. The courts thus enforced the traditional rule that nonprofit enterprises are not exempt from the antitrust laws, but implied openness to considering nonprofit status as a relevant consideration if supported by other evidence that anticompetitive effects would not be produced.

Here, such evidence exists in the form of Dr. Lynk's findings that market concentra-

tion among nonprofit hospitals is not correlated with higher prices, but with lower prices. This correlation is acknowledged by the FTC's Dr. Leffler, although the causes thereof are a matter of speculative dispute. Such evidence is also presented in this case through the testimony of the chairman of each hospital's board, with whom the merger idea originated. David Wagner is chairman of the Blodgett board and both chief executive officer and chairman of the board at Old Kent Financial Corporation, one of the largest and most successful bank holding companies in the Midwest, and one of the largest employers in the Grand Rapids area. Richard M. DeVos is chairman of the board at Butterworth and is co-founder of the largest employer in the Grand Rapids area, the Amway Corporation, one of the largest direct retail distributors in the world. They both testified convincingly that the proposed merger is motivated by a common desire to lower health care costs and improve the quality of care.

The FTC does not challenge defendants' assertion that board members who are business leaders and community leaders have community interests at heart. The FTC does not allege that community board members would exercise market power intentionally to injure the consuming public. The FTC does not allege that community board members would exercise market power intentionally to injure the consuming public. The FTC points to evidence, however, that board members quickly develop institutional loyalty that may overcome their vigilance of community interests. The FTC also points to the above-average profit margins realized in recent years by both Blodgett and Butterworth as evidence that both boards have exercised market power to charge higher than necessary prices and realize above-average profits, which are not in the community's best interests. The FTC acknowledges that these profits remain in the respective hospitals and may be used to improve quality, thereby benefitting the community, but maintains this benefit can not be equated with the benefits that flow from free competition.

The Court does not dismiss the FTC's concerns as unreasonable or unfounded, but on balance, the Court finds them unpersuasive. The nonprofit status of the hospitals is not a dispositive consideration, but it is material, as evidenced by Dr. Lynk's undisputed empirical findings. These findings suggest that a substantial increase in market concentration among nonprofit hospitals is not likely to result in price increases. In addition, the involvement of prominent community and business leaders on the boards of these hospitals can be expected to bring real accountability to price structuring, especially in view of the "Community Commitment," discussed *infra.* The hospitals' past realization of above-average profit margins does not undermine this impression. Contrarily, the fact that healthy profit margins were realized even as the hospitals maintained below-average prices indicates not exercise of market power, but responsible stewardship. See *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406, 1412 (7th Cir.1995) (exercise of monopoly power cannot be implied from high rate of return, which may rather reflect low costs resultant from superior efficiency).

### 3. Competition in the Market

The exercise of market power in anticompetitive ways is likely to be deterred if other competitors may easily enter the market. Here, defendants concede that there are substantial barriers to new entry into the relevant market. The Grand Rapids community is already served by sufficient inpatient hospital bed capacity and authorization for construction of a new general acute care hospital in the area is not likely to be granted under Michigan's "certificate of need" laws.

Still, defendants contend that if the proposed merger were accomplished, St. Mary's and Metropolitan would continue to compete significantly with respect to primary and secondary care services. Defendants contend that both hospitals are well-established and respected, and observe that St. Mary's is part of the Mercy Health Services System, the largest hospital system in Michigan, and has the capacity to expand tertiary care services should the merged entity unilaterally raise prices. Considering the record as a

whole, however, the Court finds that, due to the greater range of services and the perceived higher quality of care available at defendant hospitals, St. Mary's and Metropolitan's ability to compete with the merged entity and defeat a small but significant price increase would be limited, especially for the foreseeable future.

#### 4. Community Commitment

In the way of additional assurance that the merged entity would not exercise its market power to raise prices or otherwise injure the community, defendants offer the "Community Commitment." The Community Commitment is characterized by the hospitals as "a series of formal assurances to the West Michigan community to assuage any purchaser concerns and to reiterate [the hospitals'] strong conviction that the purpose and intent of the transaction is to reduce costs—and to pass those cost savings on to consumers—rather than to increase prices or unfairly disadvantage payers." The Community Commitment has five parts: (1) the commitment to freeze list prices or charges, (2) the commitment to freeze prices to managed care plans at pre-merger levels, (3) the commitment to limit margins, (4) the commitment to the underserved and medically needy, and (5) the commitment regarding governance of the merged entity. Defendants are willing to enter into a consent decree making the Community Commitment legally binding upon them in the event the merger is allowed to proceed.

The FTC contends the Community Commitment is in various respects either unenforceable, illusory or inadequate. The first part of the Community Commitment, the "charge commitment," provides as follows:

> In the first three years following consummation, the merged entity will freeze all hospital charges (both inpatient and outpatient) at current levels. In years four through seven, the merged entity will limit increases in charges to no more than the annual percentage increase in the regional all product CPI as computed by the U.S. Department of Labor.

(Footnotes omitted). The FTC contends this commitment offers inadequate assurances to the community because it is temporary and because it is illusory inasmuch as hospital price increases have been decelerating in recent years and prices may even decrease in the future.

The second part is defendants' commitment to freeze prices to managed care organizations. The FTC contends this commitment is designed to "level the playing field," equalizing the rates charged to managed care organizations and eliminating the competition among them that has been so successful in securing discounts and price reductions. The FTC contends this commitment is deliberately anticompetitive.

The third part of the Community Commitment, the "margin commitment," provides that defendants agree to "target a five-year rolling average total margin for the merged system that does not exceed the average of Moody's and Standard & Poor's upper quartile total margins for other health systems nationally." This margin is said to be currently in the range of 7 to 8% and is lower than the current operating margins realized by both Butterworth and Blodgett. The profit margin commitment is to continue "in perpetuity." The FTC is unimpressed by this commitment because it enables defendants to realize profits far above average in the industry and greater than necessary to remain competitive.[4]

The FTC's objections to the Community Commitment are not completely unfounded. It is difficult to conceive of any commitment of this nature that would provide failsafe assurances to the community. Still, it bespeaks a serious commitment by defendants—a commitment to which they can be held accountable—to refrain from exercising market power in ways injurious to the consuming public. It also corroborates other evidence that nonprofit hospitals may be treated differently under the antitrust laws, and further undermines the predictive value of the FTC's prima facie case.

---

**4.** The FTC has not specifically challenged the fourth and fifth parts of the Community Commitment.

### 5. Impact on Managed Care Organizations

Beyond its prima facie showing, the FTC's case has been largely based on the narrow hypothesis that defendants' enhanced market power would enable them to stem the growing influence of managed care organizations, whose growth has competitively secured discounts from hospitals, assertedly benefiting consumers and promising to produce further benefits. Indeed, defendants have made no secret of their desire, in the event of merger, to level the managed care organization playing field by establishing standard managed care rates. This would result in rate increases for some managed care organizations and rate reductions for others. The FTC has argued that this purpose and eventual effect are anticompetitive.

It is undisputed that managed care organizations have exercised leverage to obtain discounts from Grand Rapids hospitals. On the surface, these discounts appear to represent savings for some consumers. Certainly, the discounts result in profits for the managed care organizations, which may be viewed as "consumers" in some respects. See *Freeman Hosp.*, 69 F.3d at 270 n. 14. The discounts also result in savings to constituent groups, such as employers who contract for purchase of health care services with a managed care organization. To the extent these savings are passed on to covered employees and their families, through pay increases and improved benefit packages, the ultimate consumers of the health care services even realize a benefit from the discounts.

However, defendants have presented substantial and compelling evidence that these supposed savings ultimately result in cost shifts. Savings realized by some consumers are recouped by the hospitals through increased charges to other consumers. Inasmuch as the hospitals clearly do not have the economic or political ability to shift these costs to the largest group of consumers treated by each hospital, consisting of patients whose health care is paid for by the federal or state government, the burden of cost shifting necessarily falls on consumers who purchase health care or insurance independently or who are covered through employers not entitled to the managed care discounts.

Viewing the managed care discounts in light of their impact on the welfare of consumers as a whole exposes them as illusory. Such selective price advantages are hardly the sort of benefit the antitrust laws are designed to protect. This, presumably, explains why most of the evidence of community opposition to the merger comes only from these same managed care organizations, who are not disinterested, and not from employers. Despite its diligent efforts, the FTC has turned up remarkably little employer opposition. In fact, HealthCare 2000, representing over 80 local employers, supports the merger.

The FTC argues the discounts need not result in cost shifts if the hospitals recoup their costs through improved operating efficiency. Yet, the FTC also concedes that defendant hospitals are already among the most efficient and best run hospitals in the state, if not the nation.

The costs of discounts might also be recouped, the FTC argues, through reduction of defendants' above-average profit margins. With nonprofit hospitals, however, reduced operating margins simply mean less funds to reinvest in each hospital. Such reinvestment necessarily results in benefits to consumers in the form of expanded and improved services. The FTC has offered no evidence that would even suggest, much less establish, that the operating margin at either hospital has produced funds that have been wasted or otherwise misspent. In fact, the undersigned's tour of both facilities confirmed the impression that the boards of both institutions have been responsible stewards of the resources available to them and have continuously reinvested substantial sums in their facilities to keep pace with medical and patient demands. Reduction of the resources available could only have adverse effects on the quality of care provided.

Accordingly, the Court is not at all persuaded that maintenance of the status quo, good as it has been, would result, through continuation of the current competition among managed care organizations, in bene-

fits to consumers as a whole superior to those likely to be realized in the event of the merger. Continued cost shifting benefits only select groups of consumers, not consumers as a whole.[5]

### 6. Efficiencies Defense

The primary avowed impetus for this proposed merger is defendants' desire to avoid substantial capital expenditures which both hospitals would otherwise be required to make and to achieve significant operating efficiencies by coordinating activities and eliminating duplicative services. Defendants contend these anticipated efficiencies will enable them to provide better quality services to the community at reduced cost. As it considers the potential anticompetitive effects of the proposed merger, defendants contend, the Court must take cognizance of these putative benefits to consumers as well.

The courts have recognized that "in certain circumstances, a defendant may rebut the government's prima facie case with evidence showing that the intended merger would create significant efficiencies in the relevant market." *University Health,* 938 at 1222; *Mercy Health Services,* 902 F.Supp. at 987. "[E]vidence that a proposed acquisition would create significant efficiencies benefiting consumers is useful in evaluating the ultimate issue—the acquisition's overall effect on competition." *University Health,* 938 F.2d at 1222. In order to overcome the presumption arising from the FTC's prima facie case that the proposed merger would substantially lessen competition, defendants "must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers." *Id.* at 1223.

The parties' experts have provided detailed estimates of the capital expenditure savings and operating efficiencies that would be realized by defendants in the event of merger. Defendants assure the Court that, absent the merger, Blodgett will undertake the major expense of building a new replacement facility. Blodgett is committed to spending all that its financial condition will permit it to borrow, $187 million, on the replacement facility to enable effective competition with Butterworth in the ongoing "medical arms race."

Butterworth, for its part, prior to any merger discussions, formulated a plan to renovate and upgrade its existing facilities at an estimated cost of $73.9 million. Hence, the combined capital expenditures defendants would be required to absorb if they do not merge would be $260.9 million.

In the event of a merger, most inpatient services provided by the merged entity would be provided at Butterworth's downtown campus, requiring substantial expansion of facilities at a cost of $93.5 million. In addition, at the "Beltline site," where Blodgett would otherwise build its replacement facility, a comprehensive outpatient center would be constructed, with capacity for 76 inpatient beds for surgical stays of under 72 hours. The cost of this proposed construction would be $67 million. Finally, Blodgett's present "Ferguson facility" would be renovated and developed into offices for financial and nursing departments, at a cost of $1.2 million. The capital expenditures necessitated by the proposed merger would, therefore, in defendants' estimation, total $161.7 million; $99.2

---

**5.** The thrust of the FTC's case in this regard is artificially and misleadingly narrow. It focuses on and unduly emphasizes adverse consequences the merger might have for a very limited segment of hospital care consumers, recipients of primary and acute care inpatient hospital services purchased by managed care organizations at discounted rates. The argument ignores the benefits that other consumers might realize as a result of the merger, e.g., patients not covered by managed care organizations plans and secondary and tertiary care patients.

The Court acknowledges that antitrust analysis of hospital mergers has traditionally employed the "cluster of services" approach. The approach is not without its utility, but it ignores the consumer-beneficial synergistic interplay among the different lines of hospital services, primary, secondary, tertiary and quaternary. When this weakness is compounded by a claim that focuses even more narrowly on a small subset of the consumers of the relevant cluster of services, the potential for distortion is magnified. Recognition of this distortion has caused the Court not only to reject the FTC's present argument, but also to question the reliability of the cluster approach in evaluating hospital mergers in today's evolving and increasingly complex world of health care services.

million less than the capital expenditures that would be necessitated if the merger is not accomplished.

With respect to operating efficiencies, defendants have presented evidence indicating they would save approximately $68.5 million in the first five years after the merger.

The FTC contends defendants' projected savings are greatly exaggerated. The FTC's expert testified that the $187 million cost of Blodgett's proposed replacement facility could be reduced by $50 million simply by eliminating unnecessary amenities (e.g., an atrium, "circulation space" and an optional parking garage), by moving administrative functions from more costly space at the Beltline site to cheaper space downtown, and by financing the physician office building in a manner comparable to that envisioned under the merger scenario. In addition, the FTC contends defendants have underestimated by $7 million the cost of the comprehensive outpatient facility to be constructed at the Beltline site in the event of a merger. The FTC thus concludes the proposed merger would result in a total capital expenditure avoidance of no more than $42 million.

The FTC also challenges defendants' operating efficiencies estimate, contending that it is overstated by at least $32 million.

The Court has duly considered both sides' estimates and finds strengths and weaknesses on both sides. Because measuring the efficiencies of a proposed transaction is inherently difficult and because both sides' estimates are clearly based in some measure on speculative self-serving assertions, see *University Health*, 938 F.2d at 1223, the Court finds it neither appropriate nor necessary to engage in a detailed evaluation of the competing views.

In exercising its discretion to sort out the expert testimony and determine what is most sound, reliable and persuasive, see *Freeman Hosp.*, 69 F.3d at 269 n. 12, the Court notes the striking disparity in quality between the comprehensive studies done by defendants' experts, on the one hand, and the FTC's expert's critical analysis. Defendants' experts were part of multi-disciplinary teams who spent as much as four months in Grand Rapids inspecting the hospital facilities and conducting hundreds of interviews. The FTC's expert admitted he had not been to Grand Rapids in over 20 years. He did not conduct independent capital avoidance and efficiencies studies, but merely critiqued those done by defendants' experts. While the FTC's expert succeeded in raising questions concerning the integrity of some of defendants' calculations and estimates, much of defendants' efficiencies defense has not been effectively challenged.

Moreover, the tour of both defendants' hospital facilities was instructive. While both hospitals are presently well-maintained, there is no question that the physical limitations of the Blodgett site significantly hinder Blodgett's ability to continue to successfully compete with Butterworth and attract the best qualified physicians as medical services and technology continue to evolve. There is also no question, in this Court's considered opinion, that the Blodgett Board of Directors, in the exercise of their fiduciary responsibilities, will proceed with the plan to abandon the current Blodgett site and build a replacement hospital if the merger is frustrated. In this event, the Butterworth Board of Directors will just as surely proceed with the plan to renovate and upgrade the existing Butterworth facilities, and likely expand them, in order to compete with Blodgett's brand new, state-of-the-art facilities. The medical arms race would thus continue, at great expense to defendants and ultimately to consumers.

In sum, the Court is persuaded that the proposed merger would result in significant efficiencies, in the form of capital expenditure avoidance and operating efficiencies, totaling in excess of $100 million. This is, by any account, a substantial amount, and represents savings that would, in view of defendants' nonprofit status and the Community Commitment, invariably be passed on to consumers.

## C. *Likelihood Of Ultimate Success*

Preliminary injunctive relief is appropriate only if the FTC shows a likelihood of ultimate success by raising serious questions about the probability that the proposed

merger would hurt consumers by substantially lessening competition. The FTC has made its prima facie case, creating a presumption of illegality. Defendants have attempted to rebut the presumption by demonstrating that, even though competition may be lessened, the interests of consumers are, under the unique circumstances of this case, likely to be advanced rather than hurt, through the provision of more efficient, higher quality, and lower cost health care. The Court, having toured each of the would-be merging hospitals, having received considerable testimony from the witness stand in which the Court actively participated through its own questioning of witnesses, having duly considered the voluminous exhibits introduced by the parties, and having carefully considered the arguments of able counsel on both sides of this case, concludes that defendants have persuasively rebutted not only the FTC's prima facie case, but also the FTC's additional evidence of anticompetitive effect.

Of critical importance in the Court's evaluation of the evidence, as detailed above, are the following considerations. First, nonprofit hospitals operate differently in highly-concentrated markets than do profit-maximizing firms. Second, the boards of these two hospitals are comprised of prominent community and business leaders whose employees depend on these facilities for services, and who have demonstrated their genuine commitment to serve the greater Grand Rapids community through their governance of the hospitals. Third, both boards have given this commitment concrete form through the Community Commitment and their agreement to be legally bound thereby. Fourth, the Court's obligatory concern for the welfare of consumers as a whole, rather than merely for select groups of consumers, sheds a different light on the issues than have many of the FTC's more narrowly focused contentions. Fifth, substantial cost-savings and efficiencies would be realized as a result of the merger.

There is no question but that the FTC has demonstrated that the merged entity would have substantial market power in two relevant markets. The FTC has ultimately failed to show, however, that this market power is likely to be exercised to the detriment of the true consumers of these health care services. As indicated *supra*, the Court recognizes that managed care organizations may, in a narrow legal sense, legitimately be considered a form of consumers even though they do not receive the health care purchased. Yet, in considering the likely implications of the proposed merger for the community as a whole, the Court must evaluate the "detrimental" effect upon some consumers in light of the benefits promised to others. Further, the interests of managed care organizations, as health care intermediaries, pale in comparison with those of the actual health care consuming public, whose interests, this Court is convinced, would ultimately be best served by granting defendants freedom to proceed with the merger.

In the real world, hospitals are in the business of saving lives, and managed care organizations are in the business of saving dollars. Managed care organizations' interest in maintaining a competitive edge cannot be allowed to trump either hospitals' conscientious endeavors to continue to provide comprehensive, high quality health care in this rapidly evolving field, or the consuming public's right to receive the same.

Permitting defendant hospitals to achieve the efficiencies of scale that would clearly result from the proposed merger would enable the board of directors of the combined entity to continue the quest for establishment of world-class health facilities in West Michigan, a course the Court finds clearly and unequivocally would ultimately be in the best interests of the consuming public as a whole.

Accordingly, the Court concludes the FTC has not demonstrated a sufficient likelihood of ultimate success on the merits of its claim under the Clayton Act.

## IV. CONCLUSION

In reaching this conclusion, the Court has done its best to both weigh the equities of the parties' competing positions and consider the public interest. Based on the foregoing analysis, as well as evidence that the proposed merger, promising significant benefits to West Michigan, may be abandoned if it is

preliminarily enjoined, it is this Court's settled opinion that the motion for preliminary injunction should be denied. Although this proposed transaction is one which the FTC is facially justified in challenging, and although counsel for the FTC have ably and diligently presented their case, based on the unique facts and circumstances that have come to light in these proceedings, the Court is firmly convinced that the health care consuming public in both the immediate Grand Rapids area and greater Kent County, and in West Michigan as a whole, and indeed, the public interest in general, are best served by allowing defendants the freedom to pursue the proposed merger.

An order consistent with this opinion, denying the FTC's motion for preliminary injunction and awarding judgment to defendants in this matter shall issue. As a condition of issuance of the judgment order, however, the Court will require defendants, through their counsel and chief executive officers, to sign and submit for approval a proposed consent decree incorporating the terms of the Community Commitment and expressing defendants' agreement to be bound thereby during the pendency of any appeal from this Court's order or during the pendency of any administrative proceedings, to the extent actions in furtherance of the merger and implicating the assurances of the Community Commitment are undertaken. The proposed consent decree shall be submitted within 14 days. The Court's order shall issue upon receipt and approval of the proposed consent decree.

### JUDGMENT ORDER

Plaintiff Federal Trade Commission having petitioned the Court for a preliminary injunction under § 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin the proposed merger of two hospitals operated by defendants Butterworth Health Corporation and Blodgett Memorial Medical Center; and

The Court having set forth its ruling on the Federal Trade Commission's petition in a 44–page written opinion dated September 26, 1996; and

The Court having conditioned its denial of preliminary injunctive relief upon the Court's approval of a proposed consent decree to be submitted by defendants incorporating the terms of their "Community Commitment," as reflected in their "Statement of Actions Planned in the Event of a Merger;" and

Defendants having submitted the subject consent decree and the Court having approved it for entry herewith; now, therefore, and for all the reasons set forth in this Court's opinion dated September 26, 1996,

**IT IS HEREBY ORDERED** that the Federal Trade Commission's request for preliminary injunctive relief is **DENIED** and **JUDGMENT** is **AWARDED** to defendants in this action.

### CONSENT DECREE

In its Opinion dated September 26, 1996, in the above-captioned matter, the Court ruled that as a condition of entering an order denying the Federal Trade Commission's motion for preliminary injunction and awarding judgment to the defendants in this matter, defendants Butterworth Health Corporation and Blodgett Memorial Medical Center would be required to sign a proposed consent decree containing certain terms.

Accordingly, defendants Butterworth Health Corporation and Blodgett Memorial Medical Center hereby agree that in the event that they elect to take any actions in furtherance of their merger, they will be bound by the terms of the Statement of Actions Planned in the Event of a Merger ("Community Commitment"), which is attached hereto as Exhibit A and incorporated herein.

### ORDER

The Court having reviewed and considered the foregoing Proposed Consent Decree of Butterworth Health Corporation and Blodgett Memorial Medical Center in the above-entitled action,

IT IS HEREBY ORDERED that the Proposed Consent Decree, which incorporates the Statement of Actions Planned in the Event of a Merger ("Community Commit-

ment"), as set forth above, shall hereby enter as an Order of this Court.

IT IS FURTHER ORDERED that although this case is terminated in this Court by the Judgment Order of even date, the Court shall, during the pendency of any appeals from this Court's Judgment Order and/or during the pendency of any administrative proceeding concerning the antitrust implications of the proposed merger and/or during the pendency of any appeals from a final administrative decision, retain jurisdiction for the purpose of enabling any of the parties to this action, or their successor(s), to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction and carrying out of this Consent Decree, for modification thereof, and for the purpose of enforcement of compliance therewith.

EXHIBIT A.

In The United States District Court

for the Western District of Michigan

Southern Division

Civil Action No. 1:96CV49

Federal Trade Commission, Plaintiff,

v.

Butterworth Health Corporation,
a Michigan corporation,

and

Blodgett Memorial Medical Center
a Michigan corporation,
Defendants.

David W. McKeague, U.S. District Judge

*STATEMENT OF ACTIONS PLANNED
IN THE EVENT OF A MERGER*

In the Scheduling Conference held on January 26, 1996, the Court requested that the

defendants Blodgett Memorial Medical Center and Butterworth Health Corporation (together "the Hospitals"), describe for the Court the actions planned by the Hospitals in the event that a Preliminary Injunction is not granted by this Court.[1] Specifically, the Hospitals were asked to describe the commitments made to the community and the structural and operational changes envisioned during the time period required for the Federal Trade Commission (the "FTC") to conduct an administrative proceeding.

## COMMUNITY COMMITMENT

The Hospitals have communicated a series of formal assurances to the West Michigan community to assuage any purchaser concerns and to reiterate their strong conviction that the purpose and intent of the transaction is to reduce costs—and to pass those cost savings on to consumers—rather than to increase prices or unfairly disadvantage payers. These representations (collectively referred to as the "Community Commitment") provide assurances to the community that the combined Hospitals will freeze prices to commercial payers, limit overall operating profits, provide significant managed care payers the option of a level playing field with Priority Health, protect the poor, and provide for increased community and business involvement in Hospital decision making.

The price freeze to commercial payers is a commitment to freeze prices at current levels for the first three years following the merger, *and,* in the ensuing four years, to increase prices annually by no more than the increase in the regional Consumer Price Index (CPI)

1. As the Hospitals have previously pointed out, the existence of a preliminary injunction prohibiting the merger would end the Hospitals' merger attempt, because the Hospitals cannot wait for the completion of the FTC administrative hearing to begin implementation of their merger plans. FTC Administrative proceedings may take two years, or more, to complete. *See In Re Adventist Health Sys./West and Ukiah Adventist Hosp.*, FTC Docket No. 9234 (*"Ukiah"*) (Exhibit E to "Defendants' Preliminary Legal Memorandum in Opposition to Plaintiff's Motion for a Preliminary In-

junction"). If this Court declines to prohibit the merger, and that determination is affirmed (assuming the FTC elects to appeal), then the hospitals will urge the FTC to forego an administrative proceeding, as specifically provided for in an FTC Policy Statement (the "Statement") (Exhibit A, attached). However, the Hospitals have not, as yet, determined whether they would go forward with the merger if, absent an injunction, the FTC nevertheless persists in holding an administrative hearing.

as published by the U.S. Department of Labor.

Specifically, there are five distinct parts to the Community Commitment: (1) the commitment to freeze list prices or charges, (2) the commitment to freeze prices to managed care plans at pre-merger levels, (3) the commitment to limit margins, (4) the commitment to the underserved and medically needy and (5) the commitment regarding governance of the merged entity.[2]

*Charge Commitment.* The Hospitals have committed to freeze or control the rate of annual increase in charges for a period of seven years following the merger.[3] In the first three years following consummation, the merged entity will freeze all hospital charges (both inpatient and outpatient) at current levels.[4] In years four through seven, the merged entity will limit increases in charges to no more than the annual percentage increase in the regional all-products CPI as computed by the U.S. Department of Labor.[5]

*Commitment to Managed Care.* The Hospitals have pledged not to raise prices to managed care plans as a group after the merger. This feature eliminates the possibility that the merged entity might give unfair preferential pricing treatment to Priority Health, an HMO currently a part of Butterworth Health Corporation.

The commitment to managed care imposes an upper limit, or ceiling, on the price that a managed care plan will pay for hospital services. The salient features of the Hospitals' proposal is that (1) any of the three largest existing independent health maintenance organizations (Grand Valley HMO, Blue Care Network and Care Choices) will be offered

new contracts with the merged entity at inpatient and outpatient hospital rates that equal the weighted average (*see* Exhibit B, attached) of the rates currently paid to both Hospitals by these plans and Priority Health; and (2) Priority Health will pay inpatient and outpatient hospital rates to the merged entity that are equal to this same weighted average. In the first three years after merger, the weighted average base inpatient and outpatient rates for these health maintenance organizations will be frozen. For years four through seven, the weighted average rates will be allowed to increase annually by no more than the increase in the regional all-products CPI.

Existing managed care plans, other than these four major health maintenance organizations may elect to freeze their current contracts for three years following the merger with subsequent annual increases for the next four years limited to the increase in the regional all-products CPI. Plans included in this group include Preferred Provider Organization of Michigan (PPOM), Healthcare 2000 and similar managed care plans that are smaller than the aforementioned four HMOs.

Any new managed care plan will be offered a discount commensurate with the incremental volume that the plan can deliver to the merged entity.[6] If any of the four large health maintenance organizations mentioned above seeks to enter into a capitation risk agreement with the merged entity (i.e., an agreement whereby the merged entity receives a fixed payment set in advance for providing hospital services to a covered population group), the merged entity will offer a uniform capitation rate to each of these large HMOs so long as the plans utilize the same

---

2. The first three commitments are jointly described as the "Pricing Commitments."

3. Currently, 30.5% and 23.3%, of Blodgett and Butterworth's respective revenues are derived from charge paying patients. The remainder of the Hospitals' revenues come from non-charge paying payers including Medicare, Medicaid, Blue Cross indemnity, and all HMOs/PPOs (including Blue Care Network, Michigan Blue Cross and Blue Shield's HMO product).

4. Initially, charges will be frozen at the current levels of the two merging hospitals. As soon as

practical, the hospitals will merge their charge masters and charges will be frozen at the weighted average of the current Blodgett and Butterworth levels.

5. Annual increases could be lower, but not higher than the increase in this CPI.

6. In addition, if at some point in the future the merged entity divests Priority Health, it will thereafter deal with Priority Health on an arms-length basis that reflects the volume that Priority Health can deliver to the merged entity.

uniform underwriting criteria (*e.g.*, community rating versus experience rating) with respect to the covered population and provide an actuarially appropriate number of covered lives.

The proposed price commitments to managed care plans effectively constitute a price decrease. To the extent that managed care contract rates would rise in years two and three if the merger did not occur, or would increase at rates higher than the CPI in years four through seven, the four largest managed care payers will pay less to the merged entity. Further, managed care payers will benefit because they will be able to contract with *both* Butterworth and Blodgett post-merger at pre-merger rates. Currently, neither Care Choices, Blue Care Network, nor Grand Valley Health Plan has a contract with Butterworth Hospital for routine inpatient care. Additionally, Priority Health does not have a contract with Blodgett. Subscribers of these plans are clearly better off post-merger because they gain the option of using either Blodgett or Butterworth as in-network hospitals. For these subscribers, the added option of using either merging hospitals represents a real improvement in quality and a reduction in the quality-adjusted price paid by the managed care plan.

The impact of the pricing commitments for the charge-paying, managed care and self pay populations is considerable. The historical seven year average annual price increase at the two Hospitals was approximately 6.2% for indemnity/self pay patients, and an estimated 3% for managed care plans. Projecting these historical increases seven years into the future, and comparing the total with the same seven year projections under the pricing commitments results in a revenue difference of $207 million. This amount represents a considerable pass-through to the community.

Blue Cross–Blue Shield of Michigan's traditional indemnity product is not specifically addressed by the proposed commitment because pricing for this product is established by Blue Cross using a generic formula and the product is offered to Michigan hospitals on a take-it-or-leave-it basis. Even though many businesses in Western Michigan would prefer that the merged entity discontinue discounts to this product or, at least, provide discounts to Blue Cross which are not greater than the discounts offered to other managed care plans or charge-paying employers, the Hospitals believe they must continue to participate in this product at rates stipulated by Blue Cross.

*Margin Commitment.* In addition to the pricing commitments, the merged entity will target a five year rolling average total margin [7] for the merged system that does not exceed the average of Moody's and Standard & Poors upper quartile total margins for other health systems nationally. This margin is currently in the range of 7 to 8%, and is lower than the current operating margins of either Butterworth or Blodgett. This profit margin commitment continues in perpetuity. Of course, during the first seven years the charge commitment and the commitment to managed care may result in lower margins than this target. If post-merger operating efficiencies would result in higher margins than the target level during any five-year period, then the merged entity's prices will be reduced below the commitment cap levels to prevent margins from exceeding the target level.

*Commitment to the Underserved.* The respective missions of both Hospitals have always been, since the inception of each institution, to serve all members of the community, without regard to ability to pay. The Hospitals have committed to establish a fund to provide quality healthcare programs for the underserved in the community, including services such as community based clinics, immunization and preventative care, and health education programs. Collectively, the Hospitals currently fund an estimated $16 million per year for care for the underserved. Of this amount, approximately $2 million is identified as direct funding for programs like community based clinics and other similar programs.

The Community Commitment fund will include a budgeted item in the amount of $6

---

7. Total margin includes operating margin and investment income.

million per year—triple the current amount of these targeted contributions.[8] The policies for the use of the fund will be determined using formal community input, including stakeholder representation, from existing community groups and committees including Healthy Kent 2000, the Kent County Health Department, neighborhood groups, and others. An Advisory Committee to the Board will be formed, including participation from the groups identified above, to provide ongoing allocation of this fund.

*Governance.* The Hospitals have committed to constitute a Board for the merged entity that includes local business representatives, physicians, and community members, and that is also reflective of the diversity in background, culture, community involvement and professional interests of West Michigan. The new Board will consist of three components: board members currently serving on the Board of Butterworth, board members currently serving on the Board of Blodgett, and board members from the community who have not previously served on these Hospital boards.

The Community Commitment also opens the budget and pricing process of the merged entity to the public for both input in advance of adoption of the budget and scrutiny of past performance. A permanent Advisory Committee will be created to counsel the Finance Committee of the merged entity's Board during the budgeting process, and prior to any budgetary recommendation to the entity's Board. The Committee members will include representatives from the business community, health care purchasing groups, associations, and the community at large.[9] The new entity will also publicly disclose its pricing, budget targets, and rationale each year in an open meeting prior to the implementation of new pricing structures. Data will be made available to the general public, and an independent accounting firm selected by the Advisory Committee, but compensated by the institution, will assist in the meeting and data interpretation.

## SUMMARY

We believe that, as a practical matter, the Community Commitment is enforceable because of the provision for public review, and the existence of an oversight committee comprised of business and community representatives. Moreover, many of the hospital trustees are major payers of the costs of their employees' hospitalization. These individuals are motivated to decrease the cost of health care paid for by their own businesses. We have also offered to enter into a binding consent decree with the FTC regarding the Community Commitment. Under such a decree, the Community Commitment would become an enforceable order of the Court. To date, the FTC has declined. Nevertheless, we hereby reaffirm the offer.[10] Similarly, we would have no objection to the Court's imposing the Community Commitment on the Hospitals as part of its Order in this case, although we think the evidence demonstrates that such an action is unnecessary as an element of merger approval.[11]

8. Taken together, the savings resulting from the price commitment ($29.6 million per year), and the additional commitment to the underserved ($4 million per year), represents a combined benefit to the community of approximately $170 million over the first five years. This figure equals the five year merger-related savings computed by the Hospitals. Hence, during the first five years, all of the merger related efficiencies calculated by the consultants will be transferred to the community through revenue reductions, or additional services to the underserved. Of course, the price commitments continue beyond the five year time period of the efficiency studies.

9. Although the community has a longstanding tradition of voluntary community service, if the Advisory Committee members believe that they must be compensated in order to adequately perform their responsibilities, reasonable compensation will be provided.

10. While the FTC has rejected the consent decree approach, states have not. *See* Exhibits C through H, attached.

11. Although the FTC will argue that the statute does not permit the Court to fashion a decree permitting the merger to go forward with conditions, courts have substantial discretion in fashioning relief. *See F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083–1085 (D.C.Cir.1981); *F.T.C. v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314–1315 (8th Cir.1991); *F.T.C. v. Amy Travel Serv.*, 875 F.2d 564, 571–572 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989); *see* also *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir.1989).

## IMPLEMENTATION OF PROPOSED STRUCTURAL AND OPERATION CHANGES

Many of the structural and operational changes to be implemented in the event of a Blodgett and Butterworth merger have been outlined in the attached three documents: (a) Letter of Understanding, dated July 24, 1995 (see Exhibit I attached), (b) the White Paper provided to the FTC during its review of the Hart–Scott–Rodino premerger filing (Exhibit J), and (c) the Position Paper, dated August 31, 1995 (Exhibit K). The proposed changes are outlined by estimated year of implementation below.

*Years One and Two.* The activity in Year One will focus primarily on corporate and administrative reorganization, enabling the merged organization to develop its strategic, operational and facilities plans for implementation in Year Three and beyond. Within 60 days of a favorable court determination, or a decision not to further appeal any such determination (herein after "approval"), Blodgett and Butterworth will form a Michigan non-profit directorship corporation ("New Corporation"). The composition of the Board of Directors is described in the Community Commitment/Governance section above. The New Corporation Board will consist of current members of the Boards of Blodgett and Butterworth with additional community members who have not served on either Board.

Simultaneously with the creation of New Corporation, the Articles of Incorporation of Blodgett and Butterworth will be amended to make New Corporation the sole member of Blodgett and Butterworth. In addition, Butterworth will cause the Articles of Butterworth Hospital to be amended to make New Corporation the sole member of the Hospital. A Certificate of Need request will be filed with the Michigan Department of Public Health and the local reviewing agency, the Alliance for Health, for approval of the change of ownership.

Upon the creation of New Corporation, the Board will appoint the Chief Executive Officer of the merged entity. The management teams of both Blodgett and Butterworth will be consolidated and will be employed by New Corporation. Within 90 days of the approval, the Chief Executive Officer will select the Vice Presidents of the consolidated management team. Within 180 days of approval, the entire consolidated management team will be selected and employed by New Corporation.

The consolidation of the management teams will result in the elimination of approximately 50 senior and mid-level management positions.[12] No general layoffs of personnel are planned in conjunction with the merger because patient volumes are expected to remain relatively stable. The parties do anticipate that approximately 82 non-management positions will be eliminated over five years through the normal attrition historically experienced by both organizations rather than through terminations or layoffs.

Active physician involvement in the governance, strategy development and implementation process begins immediately in Year One. Upon FTC approval, the New Corporation will create a physician merger implementation team to work closely with the consolidated management team to develop a long-term strategic and clinical vision and to develop and implement a facilities plan that maintains or exceeds the promised savings and fits with the health system's strategy. This physician team will also facilitate the creation of the joint Medical Staff structure and address other clinical and operational issues affecting the merged entity. Working with the administration and Board, the physician team will coordinate physician/health system integration efforts and pursue a managed care strategy.

Within one year of approval, New Corporation will cause the consolidation of the Boards of Trustees of Blodgett and Butterworth Hospital so that a single board will govern the merged Hospitals.

*Years Three through Five.* Activities in Years Three through Five will focus on the

---

**12.** The elimination of these positions should not advantage one of the merging parties vis-a-vis the other.

implementation of clinical and operational consolidations, the facilities plan implementation, and quality and access improvements which will meet or exceed the savings promised to the community as a result of the merger.[13]

Through the strategic planning process of Years One and Two, described above—which will involve the Board, the administration, and the physician team—the plan developed by the consultants for achieving the merger related savings presented to the FTC in the "white paper" submitted with the Hart–Scott–Rodino filing (also referred to as "Scenario 3A"), will be tested under the current market conditions and payor expectations. The review of Scenario 3A will ensure that the plan is consistent with the strategic plan developed by the merged entity, that it achieves or exceeds the promised level of savings, and that it improves or maintains the quality of care provided by the health system. While the hospitals are committed to achieving the level of cost savings identified in the white paper, the clinical/operational consolidation activities and facilities plan may be adjusted to reflect community needs and opportunities to improve clinical services and patient access as the health care delivery environment continues to change.

If Scenario 3A were implemented, there would be a consolidation of the majority of inpatient services at the current Butterworth site (downtown Grand Rapids) and the development of a new campus with a small inpatient component at the Beltline site. The consolidation of two clinical areas (i.e. pediatrics and obstetrics), identified in the consultant studies could begin as early as Year Three. Moreover, construction of a new campus on the Beltline would not begin until Year Three or later.

## SUMMARY

The implementation of the structural and operational changes proposed by Blodgett and Butterworth focus primarily on corporate reorganization, consolidation of the management team, and strategic planning activities in Years One and Two, the years during which an FTC administrative hearing could be completed. Substantial clinical consolidation and construction of new facilities would not occur until Year Three or beyond. If the outcome of an FTC administrative hearing required the unwinding of the merger between Blodgett and Butterworth, the activities contemplated in Years One and Two could certainly be unraveled and the parties separated.[14]

Respectfully submitted,

/s/

Jacqueline D. Scott

Varnum, Riddering, Schmidt & Howlett, LLP

333 Bridge Street, NW

Grand Rapids, MI 49504

(616) 336–6708

/s/

John D. Tully

Warner Norcross & Judd LLP

900 Old Kent Building

111 Lyon Street, NW

Grand Rapids, MI 49503–2489

(616) 752–2000

William G. Kopit

Epstein Becker & Green, P.C.

1227 25th St., NW

**13.** Merger related savings were estimated by Blodgett's and Butterworth's consultants in the amounts of $99.2 million of capital avoidance and $70 million of operating efficiencies for years one through five of the merger.

**14.** It is difficult to accept at face value the FTC's argument that this merger had to be challenged prior to consummation. Plainly, the FTC has pursued injunctive relief rescinding mergers after they have been consummated. *See FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989). Indeed, in one recent hospital merger case, the FTC sought to undo the results of the merger five years after its consummation. *Uki-*

*ah.* It is also relevant that the FTC could have avoided significant delay by requesting a permanent, as well as (or instead of) a preliminary injunction. *See* 15 U.S.C. § 53(b); *see e.g., F.T.C. v. H.N. Singer, Inc.,* 668 F.2d 1107, 1110–1111 (9th Cir.1982); *F.T.C. v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1314–1315 (8th Cir.1991); *F.T.C. v. Amy Travel Serv.,* 875 F.2d 564 (7th Cir.) *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). Having consciously disregarded this option, the FTC has no legitimate basis for insisting that it cannot complete its administrative procedures within two years.

Washington, DC 20037–1156
(202) 861–1822

Attorneys for Defendants

Dated: March 8, 1996.

Corrected: March 27, 1996