**ADVOCACY ORGANIZATION FOR PATIENTS AND PROVIDERS, Citizens for a Better Lansing Ambulatory Surgery Center Company L.L.C., and Genesis Center, L.L.C., Plaintiffs,**

v.

**MERCY HEALTH SERVICES, Mercy St. Lawrence Corporation, St. Lawrence Hospital and Healthcare Services, Sparrow Health Systems, Edward W. Sparrow Hospital Association, Care Choices HMO, Amicare Home Health Services, Inc., Physicians Health Plan, Inc. and Sparrow Physicians Hospital Network, Defendants.**

No. CIV.A. 97–40469.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 26, 1997.

**968**

Linda S. Maliszewski, Lansing, MI, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

GADOLA, District Judge.

On November 20, 1997, plaintiffs ADVOCACY ORGANIZATION FOR PATIENTS AND PROVIDERS, CITIZENS FOR A BETTER LANSING, GREATER LANSING AMBULATORY SURGERY CENTER COMPANY, L.L.C., AND GENESIS CENTER, L.L.C. filed this action against MERCY HEALTH SERVICES, MERCY ST. LAWRENCE CORPORATION, ST. LAWRENCE HOSPITAL AND HEALTHCARE SERVICES, SPARROW HEALTH SYSTEMS, EDWARD W. SPARROW HOSPITAL ASSOCIATION, CARE CHOICES HMO, AMICARE HOME HEALTH SERVICES, INC. PHYSICIANS HEALTH PLAN, INC. AND SPARROW PHYSICIANS HOSPITAL NETWORK, to challenge the merger of the assets of Sparrow Health System and the mid-Michigan assets of Mercy Health Services. The most significant assets being combined as a result of the merger include **Sparrow Hospital** and **St. Lawrence Hospital and Healthcare Services**, as well as **Physicians Health Plan, Inc. ("PHP")**, an HMO owned by Sparrow Health System, **and Care Choices HMO**, an HMO owned by Mercy Health Services.[1] This merger is in large part a response to the recent merger of Ingham County's other hospital system, Michigan Capital Healthcare, with Columbia/HCA Healthcare Corp. Sparrow Health System and Mercy Health Services are undertaking their planned merger in order to reduce costs, to permit Sparrow to participate in Mercy's statewide

---

1. After the merger, Sparrow Health System will own 80% of the combined entity, while Catholic, Farmington Hills-based Mercy Health Services will own 20%.

network and access certain Mercy services, and to allow Mercy to continue to participate in and influence the provision of health care services in the mid-Michigan area around Lansing. Sparrow and St. Lawrence estimate that savings in operating costs from the transaction will equal $15 million annually. (Damore Aff. ¶ 10).

The merger plans call for gradual consolidation of the entities, in three phases. Phase I (1–2 years) involves coordinating purchasing and information systems and consolidating administrative support and management functions. Phase II (3–4 years) involves consolidating acute inpatient services at Sparrow Hospital and providing outpatient/ambulatory services and behavioral health services at St. Lawrence Hospital. Phase III (5 years) involves integrating financial and clinical information systems and establishing subacute/transitional care services at St. Lawrence Hospital.

The merger was first announced in December, 1996. It has been tacitly approved by the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ")[2] and is scheduled to consummate any day.

On the eve of the merger, plaintiffs filed the instant lawsuit, alleging the merger violates antitrust laws, and in particular, Section 7 of the Clayton Act, 15 U.S.C. § 17, which provides:

No person engaged in commerce or in any activity shall acquire, directly or indirectly, the whole or part of any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce, or in any activity affecting commerce in any section of the country, the effect of such acquisition may be *substantially to lessen competition or to tend to create a monopoly.*

Plaintiffs allege that if the merger is allowed to take place, it will substantially lessen com-

petition and tend to cause a monopoly in a cluster market spanning the greater Lansing area and consisting of the following products: general acute care inpatient services, primary care inpatient hospital services and outpatient ambulatory surgical services. Plaintiffs seek to enjoin the merger pursuant to Federal Rule of Civil Procedure 65 and Section 16 of the Clayton Act, the latter of which states:

Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections two, three, seven, and eight of this Act, when and under the same conditions and principles of injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

15 U.S.C. § 26.

At the present time, plaintiffs are before this court requesting a temporary restraining order ("TRO"). For the following reasons,

---

**2.** The defendants filed detailed pre-merger notifications with the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") pursuant to the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended 15 U.S.C. § 18a. After filing such notifications, there is a thirty-day waiting period in which the merger cannot be consummated so that the government can investigate the proposed merger. During the waiting period, neither the FTC nor the DOJ issued a "second request" for information, thereby approving the merger.

plaintiffs' request for a temporary restraining order will be denied.

### Injunction Standard

■ Injunctive relief "is an extraordinary remedy which should best be used sparingly." *Jerome–Duncan, Inc. v. Auto–By–Tel, L.L.C.,* 966 F.Supp. 540, 541 (E.D.Mich.1997). Injunctive relief will issue only where an extraordinary equitable case has been made by plaintiff. *Merrill Lynch, Pierce, Fenner & Smith v. E.F. Hutton & Co.,* 403 F.Supp. 336, 339 (E.D.Mich.1975).

■ When faced with a request for injunctive relief, the court must balance the following factors: (1) whether the plaintiff will suffer irreparable injury; (2) whether the public will benefit as a result of the injunction; (3) the plaintiffs' likelihood of success; and (4) whether there will be harm to others if the injunction is granted. *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982). An injunction will only be granted if the four factors weigh in favor of granting it.

In this instance, a weighing of the aforementioned four factors militates against granting an injunction. Also, the equitable doctrine of laches bars plaintiffs' request for injunctive relief.

### Laches

■ An injunction is an equitable remedy, and as such, the equitable defense of laches is applicable. The " '[d]octrine of laches' is based upon the maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity." *Blacks Law Dictionary,* 875 (6th ed.1990). "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1981) (quoted in *United States v. Weintraub,* 613 F.2d 612, 619 (6th Cir.1979), *cert. denied,* 447 U.S.

905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980)). *See Kay v. Austin,* 621 F.2d 809, 813 (6th Cir.1980) (barring plaintiff's claim for equitable relief due to laches).

■ In this instance, the first requirement of laches is present. Plaintiffs have not been diligent in pursuing their request for a TRO. Plaintiffs have known about this proposed merger at least three months, and presumably longer since the merger was announced in December, 1996. Indeed, Linda Fausey, the attorney representing all the plaintiffs in this case, on or prior to August 19, 1997, filed a complaint with the FTC on behalf of two of the plaintiffs in this case, Advocacy Organization for Patients and Providers and Citizens for a Better Lansing, to stop the merger. Because that suit was filed with the FTC three months ago, this court sees absolutely no reason *the instant* lawsuit could not have been filed earlier. Plaintiffs need not have waited until the eleventh hour to file their 98 page complaint and request for a TRO with this court. This is inexcusable delay.[3]

The second element of laches, prejudice to the defendant, exists here also. If the injunction is granted improvidently, defendants will have to renegotiate the merger, and perhaps the merger will not be consummated.

In short, this court finds that plaintiffs are attempting to throw a monkey wrench into the merger at a very late stage in the game. For this reason, this court finds that the request for a TRO should be denied.

### Plaintiffs Request for an Injunction Should Be Denied for Other Reasons

Assuming *arguendo* that laches was not appropriate, this court still would not find an injunction warranted here. Plaintiffs have not demonstrated irreparable harm, which is fatal to their request for injunctive relief. Nor have plaintiffs shown a likelihood of success on the merits. Moreover, this court is of the opinion that the harm to the public and others will be greater if the injunction is

---

**3.** This court knows of no rule requiring plaintiffs to seek relief at the FTC prior to seeking relief with the court.

granted than the harm to the plaintiffs if the injunction is not granted.

### Plaintiffs Have Not Shown Irreparable Injury

 Plaintiffs have not shown that they will suffer irreparable injury if the injunction is not granted. A showing of irreparable harm, however, is fundamental to obtaining injunctive relief. *MetroBanc v. Federal Home Loan Bank Bd.*, 666 F.Supp. 981, 984 (E.D.Mich.1987) ("A specific finding of irreparable injury to the movant is the single most important prerequisite that the Court must examine when ruling upon a motion for a preliminary injunction.").

Plaintiffs GREATER LANSING AMBULATORY SURGERY CENTER COMPANY, L.L .C., ("GLASCCO") and Genesis Center, L.L.C. ("Genesis"), physician-owned surgical centers that compete with defendants Sparrow Hospital and St. Lawrence Hospital,[4] allege that they will be irreparably harmed by the merger because they will be driven out of business as a result of it. Specifically, GLASCCO and Genesis maintain that after the merger, Care Choices HMO, affiliated with Mercy, and PHP, an HMO affiliated with Sparrow, will not refer any patients to GLASCCO and Genesis, but instead refer patients to the combined entity of Sparrow–St. Lawrence. As a result of not having patients referred to them by Care Choices and PHP, GLASCCO and Genesis assert that they will not be able to meet their requirement of 1000 surgeries, per operating room, per year, which is a prerequisite for continued licensure by the State of Michigan.

This court is not persuaded by GLASCCO's and Genesis' arguments. GLASCCO and Genesis have not demonstrated harm that will be visited upon them *as a result of the merger*, that otherwise would not occur. It is not as if GLASCCO and Genesis currently do business with Care Choices and PHP and after the merger such

business will be lost. Rather, it is uncontroverted that currently, GLASCCO and Genesis do not do business with PHP or Care Choices, and thus, after the merger, there will be no increased harm. The *status quo* would merely continue if PHP and Care Choices refuse to deal with GLASCCO and Genesis after the merger.[5]

In regard to whether Care Choices and PHP have refused to deal with GLASCCO and Genesis in anticipation of the merger, there is no evidence of this. In fact, all the evidence is to the contrary. Defendants have adduced the affidavit of Jeff Ash, Site Director at Mercy Health Plans, wherein he avers that Care Choices offered rates to GLASCCO, prior to the signing of the letter of intent between Sparrow and mid-Michigan Mercy, and thereafter in mid–1997. Defendants have also introduced the affidavit of Olga Dazzo, acting President of PHP, wherein he avers that PHP did not accept GLASCCO's request to be a provider because PHP commenced a campaign to discredit or injure PHP's good name and reputation. Thus, there is no evidence of any injury to GLASCCO and Genesis *due to the merger* .

 Likewise, the other two plaintiffs, ADVOCACY ORGANIZATION FOR PATIENTS AND PROVIDERS ("AOPP") and CITIZENS FOR A BETTER LANSING ("CBL") have failed to show irreparable injury.[6] AOPP and CBL claim that if the merger is effected, the public will be harmed because Sparrow Hospital will no longer provide late term abortions and fertility testing services. AOPP and CBL claim St. Lawrence Hospital, a Catholic institution, will demand that Sparrow discontinue such services.

Assuming this is true, this refusal on the part of Sparrow Hospital to provide abortions and fertility testing does not amount to irreparable harm. Plaintiffs have not shown that there are no alternative suppliers of

---

4. Plaintiffs maintain that the facility fee for independent surgical centers is 54% less than the facility fee for hospitals.

5. Moreover, this court recognizes that, putting the essential facilities doctrine aside because it is not relevant in this instance, antitrust laws do no require one entity to deal with another entity.

6. Also, there is a serious question as to whether these plaintiffs have standing as associations. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

these services to which consumers can turn. Indeed, at oral argument, plaintiffs attorney stated that clinics in the area have agreed to fill this void.

Plaintiffs also argue that they will be irreparably injured if the merger is consummated and later determined to be anticompetitive, such that a divestiture is necessary. *See California v. American Stores, Co.,* 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) (holding that private challenger may obtain divestiture after a merger has taken place). Plaintiffs claim that this court should interfere at the incipiency and block the merger. This court does not find irreparable injury will result from not enjoining the merger because this court sees a very minimal probability that a divestiture would ever be warranted in the future. For reasons that will be explained *infra,* this court is of the opinion that plaintiffs are not likely to succeed on the merits.[7]

Also, plaintiffs claim that if the merger is not enjoined they may lose standing to challenge it, thereby suffering irreparable harm. This court finds no merit in this contention. In making this argument, plaintiffs rely on the case of *Arrow–Hart & Hegeman Electric Co. v. FTC,* 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934), a case which held that if the *FTC* elected to challenge a merger, its challenge must be made prior to the consummation of the merger. *Arrow–Hart* is not on point since it deals with a challenge by the FTC. *Arrow–Hart* does not hold that private plaintiffs, such as plaintiffs here, lose standing to challenge a merger after it is consummated.

### Plaintiffs Have Not Demonstrated A Likelihood of Success on the Merits

The probability that plaintiffs will succeed on the merits is negligible for several reasons. First, not one of the plaintiffs has established that it will suffer an *antitrust* injury as a result of the merger. See *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109–110, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986) (holding that plaintiff

must show antitrust injury, meaning injury of the type the antitrust laws were intended to prevent and which flows from defendant's unlawful acts); *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (holding that a plaintiff must show antitrust injury in order to bring an antitrust lawsuit). For instance, as described above, GLASCCO and Genesis allege that if the merger is consummated, they will lose business. Losing business, however, is not an antitrust injury, in and of itself. Antitrust concerns come into play only if GLASCCO and Genesis are driven out of business as a result of anticompetitive conduct practiced by the merged entity (i.e., illegal restraint of trade, reciprocity, predatory pricing) or anticompetitive conditions of the market resulting from the merged entity (i.e., increased concentration under the HHI, high barriers to entry, minimal efficiencies). It is axiomatic that antitrust laws protect competition, not individual competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) ("the legislative history [of the Clayton Act] illuminates congressional concern with the protection of competition, not competitors"). Here, plaintiffs have not made any showing that the market will become less competitive after the merger. Nor have they sufficiently demonstrated how consumers will be hurt as a result of the merger. In fact, the consumers of medical services (e.g., payers, HMOs and PPOs) have not voiced objections to the merger.

Likewise, the other two plaintiffs, ADVOCACY ORGANIZATION FOR PATIENTS AND PROVIDERS ("AOPP") and CITIZENS FOR A BETTER LANSING ("CBL") have failed to show an *antitrust* injury and thus have failed to demonstrate that they have standing. As explained *supra,* AOPP and CBL claim that if the merger is effected, the public will be harmed because Sparrow Hospital will no longer provide late term abortions and fertility testing services. This refusal by Sparrow to do abortions and fertility testing is not a concern of the antitrust laws. Presumably, the public will be

---

7. In any event, there are additional remedies to plaintiffs aside from divestiture, including treble damages.

able to obtain these services elsewhere. Also, Sparrow's refusal to provide these services opens up the market for new entrants to come in and perform such services (e.g., clinics). Accordingly, this refusal of Sparrow to perform abortions and fertility testing may *increase competition.* In short, this court fails to see any antitrust injury in Sparrow's refusal to perform abortions or fertility testing after the merger.

Plaintiffs also have not done an adequate job defining the market at issue. A definition of the relevant market is critical because in order for plaintiffs to succeed on their claim they will have to show that the merger is likely to substantially lessen competition or tend to create a monopoly in the relevant market. Here, plaintiffs' market definition is wholly inadequate, and thus their likelihood of success on their § 7 claim is minimal. *See T.V. Communications Network v. Turner Network Television, Inc.,* 964 F.2d 1022, 1028 (10th Cir.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992) (affirming dismissal of amended complaint because plaintiff "did not allege a relevant product market which was capable of monopolizing, attempting to, or conspiring to monopolize"). In regard to the *product market,* plaintiffs claim that it includes general acute[8] and primary care inpatient hospital services[9] as well as outpatient ambulatory surgical services. Plaintiffs do not explain why they have included all these services in the same market. *See FTC v. Butterworth Health Corp.,* 946 F.Supp. 1285, 1289 (W.D.Mich. 1996), *aff'd.,* 121 F.3d 708, 1997 WL 420543 (6th Cir.1997) (product market is defined by identifying competitors who could provide defendants' customers with alternative sources for defendants' services in the event defendants, as a merged entity, attempted to exercise their market power by raising prices above competitive levels; the relevant product market does not include products too different or products to which consumers

would not likely turn as an alternative) and *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 172 (S.D.N.Y. 1995) (court noted that an antitrust complaint must explain why the market it alleges is the relevant economically significant product market). Indeed, this product market definition seems impracticable and irrational. Plaintiffs define the relevant *geographic market* as the "Greater Lansing area." *See Butterworth,* 946 F.Supp. at 1289 (geographic market is area to which consumers can practically turn for alternative sources of the product; the relevant geographic market does not include area so distant that consumers will not travel to that area in search of an alternative). Yet, plaintiffs have done so without providing any specific allegations as to why the market is comprised of the Greater Lansing area. Also, plaintiffs define the market this way by taking a snap-shot view of the market. Plaintiffs should have instead considered the dynamic nature of the market. *U.S. v. Mercy Health Services,* 902 F.Supp. 968, 977–78 (N.D.Iowa 1995), *vacated as moot,* 107 F.3d 632 (8th Cir.1997).

Assuming that an appropriate market has been alleged, plaintiffs are not reasonably likely to succeed on their § 7 claim for another reason, to wit: plaintiffs have not shown that the merger is likely to *substantially lessen competition* or *tend to create a monopoly* in the relevant market. *See* Section 0.1 of the DOJ/FTC Horizontal Merger Guidelines which state that the central concern of § 7 is that acquisitions "should not be permitted to create or enhance market power to facilitate its exercise;" in other words, the ultimate issue in a § 7 case is whether the merging firm acting unilaterally or collectively with other firms, will be able to increase prices above the competitive price. *See also FTC v. Freeman Hospital,* 911 F.Supp. 1213, 1221 (W.D.Mo.1995), *aff'd.,* 69 F.3d 260, 269–70 (8th Cir.1995)("[o]nce a relevant market

---

**8.** The FTC characterizes general acute care inpatient hospital services as 'a common host of distinct services and capabilities that are necessary to meet the medical, surgical, and other needs of inpatients e.g., operating rooms, anesthesia, intensive care capabilities, 24–hour nursing care, lodging and pharmaceuticals.' *FTC v. Butterworth Health Corp.,* 946 F.Supp. 1285, 1290 (W.D.Mich.1996). This has been a product

market that has been commonly used to evaluate the competitive effects of hospital mergers. *Id.* (citations omitted).

**9.** The primary care services market involves the less complex services available at most general acute care hospitals, including normal childbirth, gynecology, pediatrics, general medicine and general surgical services.

has been established, the Court must next determine whether the proposed consolidation will have anti-competitive effects"). Plaintiffs have not shown any anticompetitive effects whatsoever that will result from the merger. Plaintiffs have simply made conclusory allegations that the merged entity will have significant market power[10] and that the merger will significantly limit competition without any evidence of the same. Also, there seem to be significant efficiencies realized from this merger that plaintiffs have failed to address. *F.T.C. v. Butterworth Health Corporation,* 946 F.Supp. 1285, 1300–02 (W.D.Mich.1996), *aff'd.,* 121 F.3d 708, 1997 WL 420543 (6th Cir.1997) (recognizing the efficiencies defense in merger cases); Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") CCH ¶ 13,104 at Section 4 p. 20, 573–11.[11]

In support of their argument that the merger is anticompetitive, plaintiffs point out in their brief that Sparrow received from Blue Cross/Blue Shield of Michigan, six hundred dollars more per admission than other hospitals in Lansing. Yet, how this allegation is related to the merger is beyond this court's comprehension. This court is at a loss at how this fact shows that *the merger* is anticompetitive.

Plaintiffs also argue that the merger will cause the HMOs of Care Choices and PHP to become stronger, or in other words, more

fierce competitors. Yet, becoming a better competitor is not a § 7 violation. Moreover, as pointed out by defendants, Care Choices is not a major player in the payer market in Greater Lansing.[12] It has only a small percent of the population in the mid-Michigan area (approximately 3% of the population of Ingham, Shiawasee, Eaton, Clinton and Ionia counties). Initially, this transaction will result in the transfer of only about 4,000 Care Choices lives, representing only 1% of the population. Accordingly, the merger will have a *de minimis* effect on competition.

Finally, plaintiffs are not likely to succeed on the merits because neither the DOJ nor the FTC have challenged the merger. This is a telling sign that the merger raises no significant anticompetitive concerns.[13]

### Issuance of the Injunction Would Cause Harm to the Public

Aside from not showing likelihood of success on the merits, plaintiffs have not demonstrated that the balance of the hardships tips in their favor. Plaintiffs have not introduced any cogent evidence establishing that preventing the merger will reduce harm to them, or to the public. On the contrary, defendants have submitted affidavits and documentation supporting their contention that issuing a TRO would visit tremendous *harm* on the public (in addition to the harm mentioned earlier which would be visited on the defendants as a result of having to rene-

**10.** For instance, plaintiffs have not shown that the merged entity will have significant power in the relevant market due to such factors as high barriers to entry, *United States v. Waste Management,* 743 F.2d 976, 982–83 (2d Cir.1984) and/or low buyer power, *F.T.C. v. Elders Grain, Inc.,* 868 F.2d 901, 905 (7th Cir.1989).

Moreover, as defendants pointed out at the hearing, if prices increase after the merger, this may be beneficial to GLASCCO and Genesis, because they can also increase their prices or could lower their prices to undercut the competition.

**11.** St. Lawrence is not an effective competitor and its elimination will not in any way be anticompetitive. St. Lawrence Hospital is failing, in part due to public perception, its limited range of services compared to other hospitals, its difficulty in retaining physicians, and its less sophisticated equipment. The merger, it is hoped, will increase the efficiency of both Sparrow and St. Lawrence, and breathe new life into St. Lawrence. The merger is expected to result in cost

savings, which will be passed on to the consumer.

**12.** Plaintiffs do not allege the payer market as a relevant market in this litigation. However, the bulk of plaintiffs' arguments go to the anticompetitive nature of *this* market after the merger.

**13.** Furthermore, plaintiffs' pleadings are an amalgamation of "information, knowledge and belief." This combination provides no basis on which to render the extraordinary relief of a TRO. *Marshall Durbin Farms, Inc. v. Nat'l. Farmers Org., Inc.,* 446 F.2d 353, 357 (5th Cir.1971) ("[D]istrict courts have shown appropriate reluctance to issue [injunctive relief] were the moving party substantiates his side of a factual dispute on information and belief."). Indeed, it appears that plaintiffs are seeking a TRO so that they can maintain the *status quo* while they perform an investigation into the matter.

gotiate the merger). For instance, defendants claim that an injunction would delay or foreclose the realization of cost savings in the amount of $15 million annually to the people of Michigan. Also, St. Lawrence, which incurred losses of 1.3 million dollars in the first three months of its fiscal year, would incur further losses absent the merger.

For all the foregoing reasons, this court finds that a TRO is not warranted.

### *ORDER*

**IT IS HEREBY ORDERED** that plaintiffs' motion for a temporary restraining order is DENIED.

**SO ORDERED**.